UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **MARY P. COLVIN and JOHN COLVIN,**  <br><br>    Plaintiffs,  <br><br>v.  <br><br>**VAN WORMER RESORTS, INC. and HOTEL PUNTA COLORADA, S.A., a/k/a COLORADA,**  <br><br>    Defendants. | Civil Action Number: 2:07-4826  <br><br>OPINION  <br><br>HON. WILLIAM J. MARTINI |

**OPINION**[1]

**INTRODUCTION**

Defendant Hotel Punta Colorada, S.A. ("Colorada" or "Hotel") placed advertisements in the *Saltwater Sportsman*, a magazine targeting among others, New Jersey residents such as the Colvins, through its booking agency Baja Fishing & Resorts Co. and its successor defendant Van Wormer Resorts, Inc. In consequence of these advertisements, in February 2005, Plaintiffs Mary P. Colvin and John Colvin called Baja and booked a vacation in Mexico at Colorada. Plaintiffs arrived on or about October 6, 2005. Two days later, on the morning of October 8, 2005, while on her way to a boat, Plaintiff Mary Colvin stepped into

---

[1] For the convenience of the reader of this document in electronic format, hyperlinks to the Court's record and to authority cited herein may be inserted. No endorsement of any provider of electronic or other resources is intended by the Court's practice of using hyperlinks.

a hole (where a plank was missing) in the Hotel's wooden portable dock. Her right leg plunged through the hole, resulting in a painful split up to her groin, twisting her body. Her right leg was punctured in several spots by as many as three rusty nails, leaving (what is now) some minor scarring below the knee. She was 65 years old at the time of her injury.

Her right knee swelled up. She initially had ice placed on her knee to control the swelling. This was done on the boat itself, where Plaintiffs also took some pictures of her injury. Afterwards, she was treated in a local clinic, received a topical cream, pain medication, and a tetanus shot in consequence of the puncture wounds. These wounds did not result in any obvious or significant bleeding. As a result, she did not receive any stitches or sutures. Certainly there was no open or visible bone fracture. Since then she has participated in a therapy program: initially attending sessions at a clinic and thereafter pursuing the program by way of her own individualized regimen. At the time of her injury, over the course of what remained of her vacation in Mexico, and over the next eight weeks, she was cared for by her husband. Mary Colvin and her husband (he for loss of consortium, lost services from his wife, and his own time and inconvenience in regard to caring for his wife) brought suit against Defendants. There were no claims for economic loss, as in lost wages.

Defendants appeared, but only to contest personal jurisdiction, an issue on which they did not prevail. Subsequently Defendants refused to appear in these proceedings, and the Court found the Defendants in default. Thereafter, a damages hearing was held in which the

Colvin's testified. Mary Colvin was 69 at the time of the hearing. Again, the Defendants did not appear at the damages hearing.

For the reasons elaborated below, the Court will find that the Colvins have been damaged by the Defendants in the amount of **$172,336**.

I.   JURISDICTION

The Court possesses subject matter jurisdiction to hear this case by reason of diversity jurisdiction. *See* 28 U.S.C. § 1332. Plaintiffs' damages claim, $775,000, is in excess of the jurisdictional amount. Plaintiffs are residents of New Jersey, while Defendant Van Wormer Resorts, Inc. is a California Corporation and Hotel Punta Colorada is a Mexican entity. New Jersey is not the principal place of business for either entity. *See Hertz v. Friend*, No. 08-1107, 2010 WL 605601, 130 S. Ct. 1181 (U.S. Feb. 23, 2010) (adopting nerve center approach).

II.   FACTS AND PROCEDURAL POSTURE

The facts of this case are known to the parties and laid out in the Court's prior letter opinion. *See Colvin et al. v. Van Wormer Resorts, Inc. et al.*, Civil Action No. 2:07-cv-04826, 2008 WL 5245987 (D.N.J. Dec. 12, 2008) (denying motions to dismiss for lack of personal jurisdiction). After issuing the prior opinion, counsel for both Defendants expressly notified the Court by letter that they would participate in no further proceedings

on this matter before this Court. Plaintiffs moved for default and the Court directed the Clerk of the Court to enter default against the Defendants. Default was entered on June 29, 2009. A hearing on damages was held on February 17, 2010, which was followed by a letter submission by counsel for Plaintiffs.

## III.  STANDARD OF REVIEW

"Default establishes the defaulting party's liability for the well-pleaded allegations of the complaint." *United States v. Gant*, 268 F. Supp. 2d 29, 32 (D.D.C. 2003) (citing *Brock v. Unique Racquetball & Health Clubs, Inc.*, 786 F.2d 61, 65 (2d Cir. 1986)). Default does not establish liability for the amount of damages claimed by the plaintiff. *Flaks v. Koegel*, 504 F.2d 702, 707 (2d Cir. 1974) ("While a default judgment constitutes an admission of liability, the quantum of damages remains to be established by proof unless the amount is liquidated or susceptible of mathematical computation."). "The district court must instead conduct an inquiry in order to ascertain the amount of damages with reasonable certainty." *Credit Lyonnais Secs. (USA), Inc. v. Alcantara*, 183 F.3d 151, 155 (2d Cir. 1999).

The district court has considerable latitude in determining the amount of damages. *Jones v. Winnepesaukee Realty*, 990 F.2d 1, 4 (1st Cir. 1993). In determining the amount, the district court may conduct a hearing. Fed. R. Civ. P. 55(b)(2). The court is not required to do so, however, "as long as it ensure[s] that there [is] a basis for the damages specified in the default judgment." *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.*, 109

F.3d 105, 111 (2d Cir. 1997). "It is familiar practice and an exercise of judicial power for a court upon default, by taking evidence when necessary or by computation from facts of record, to fix the amount which the plaintiff is lawfully entitled to recover and to give judgment accordingly." *Pope v. United States*, 323 U.S. 1, 12 (1944).

IV.   **ANALYSIS**

At the outset, the Court notes that Plaintiff Mary Colvin asserts multiple bodily injuries in connection with the accident on the dock, her fall, and the injuries she sustained that day. She asserts claims, harms, and damages in connection with injuries (including loss of functionality and pain and suffering) relating to her right knee, her left knee, leg injuries, ankle and foot injuries, groin injury, thigh injury, shoulder and upper arm injuries, wrist and hand injuries, back injuries, etc., etc. As the Court explains below, some of these injuries were well-supported by the evidence presented at the damages hearing. But the Court is not satisfied that Mary Colvin has established that each and every such claim for bodily injury was causally connected to the injuries she sustained on the dock. Nor is the Court satisfied that each and every such claim comes with the requisite degree of seriousness, i.e., anything more than de minimis damages.

   A.   **Findings of Fact**

      1.   Based on the testimony at the hearing and the submissions of the parties, the Court finds that the Colvins responded to Defendants' advertisement which targeted New

Jersey residents (among others), that the Colvins traveled to Mexico after booking a stay at Colorada, and that they arrived on October 6, 2005. On the morning of October 8, 2005, Mary Colvin stepped on the Hotel's dock and was injured in consequence of an absent plank. As one leg plummeted below the dock, Mary Colvin was forced into a split. The pain to her groin was severe. Three nails penetrated her body below the knee. She was bruised in several places.

    2. Mary Colvin's injury occurred the morning of October 8, 2005, and Plaintiffs returned on the date originally scheduled for their return, October 12, 2005. The Colvins did not return home prior to the scheduled departure date. This would seem to indicate that the situation was not obviously egregious or life-threatening, at least as understood at the time. Moreover, Plaintiff testified that she only had access to a Mexican clinic that had offered her very limited treatment, i.e., where she was prescribed a cream (for the swelling of her knee) and some limited medication (for her pain along with a tetanus vaccination). Her wounds were not treated with either stitches or sutures. Given her limited access to medical facilities in Mexico, if circumstances had been thought to have been dire at the time, a prompt return to the United States would have been expected.

    3. Lost Vacation Time. In effect, although Plaintiffs did not return home, five days of a scheduled six day vacation were lost. During the remaining days of her vacation time in Mexico, Mary Colvin was using crutches, if not effectively immobilized. Likewise, given that John Colvin spent significant time, if not substantially all this time,

during those days caring for his wife, five of his six days were also lost. The cost of the vacation with travel costs was $4,513.

   4.  Costs of Medication and Therapy. Plaintiffs state that the costs of medication and therapy was some $18,495.

   5.  History of Therapy. The Court notes that documentation supplied by Plaintiffs indicates that Mary Colvin had 24 visits for therapy at the Kessler Rehabilitation Center during 2005, 2006, and 2007. After 17 such visits in 2005, she had only 6 visits over the course of 2006 and 2007. This amounts to one visit per month over the three year period following the accident. Moreover, there is *no* indication that she has continued to seek therapy or alternative means of pain management (other than over-the-counter medication, i.e., Tylenol and aspirin), notwithstanding her claims of continuing pain and suffering connected to her injuries. Her 2005 medical records indicate that she had been progressing from therapy, "but then got busy and stop[ped] coming."

 She has continued to engage in therapy-related exercises on her own – roughly 9 hours per week. Her exercise routine does not involve any apparent loss of income or out-of-pocket costs.

   6.  Travel Costs to and from Therapists. Plaintiffs state that they have incurred some $80 in travel costs to and from doctors and therapists.

   7.  The following sections detail Plaintiffs' injuries, including injuries or harms to Mary Colvin's bodily organs or bodily structures. The damages associated with

these discrete harms or injuries are not readily calculable and, for the purposes of calculating damages, the Court considers them collectively in the *conclusions of law* section that follows. *See* Part IV[B], *infra*.

        8.      Permanent Scarring. The photographs supplied by Plaintiffs, taken at or around the time of the accident, evidence one lengthy scrape below her right knee. Apparently, there was no bleeding in the immediate aftermath of the accident, nor did this scrape require sutures or stitches. And in testimony Mary Colvin indicated that this scar is no longer visible. Tr. 53:9-11. As far as the Court can tell from the photographs supplied by Plaintiffs, the puncture wounds from the nails have left little or no permanent scarring, apart from one still visible scar from a nail puncture. *See* D-1, D-7, D-11, D-12, D-21.

        9.      Pain and Suffering for Injury At or Around the Time of the Injury. The pain and suffering associated with the injury and its immediate aftermath include: pain from three nails penetrating below the knee, the painful groin split, and pain from bruising all over her body. The pain here appears substantial; the claim is well-supported by testimony and photographs taken contemporaneously. In listing this pain separately, the Court does not mean to imply that Mary Colvin's injuries have not caused some pain after the immediate aftermath of the injury, but only that the pain and suffering experienced at this time was substantial and well-supported by the record. Post-injury claims for pain and suffering are to some extent (but not entirely) undermined by the fact that Mary Colvin has not continued to actively seek out therapy or alternative means of pain management (other than over-the-

counter medication, i.e., Tylenol and aspirin). *See* ¶ 5, *supra*.

        10.    Loss of Functionality and Ability to Perform Normal Activities. At or around the time of injury, Plaintiff lost the ability to walk absent crutches or a wheel chair. The loss here is not economic as in lost income; nor pain, which was already discussed above. She was unable fully function at the level she was accustomed to pre-injury. She was unable to care for herself, i.e., putting on her shoes and dressing, for three to four months. Likewise, John Colvin suffered a loss of consortium (including losses for the time and costs of caring for his wife). John Colvin ended up doing the cooking, cleaning, shopping, driving, and general maintenance around the home – activities that Mary Colvin had largely, but not entirely, done prior to the accident. John Colvin testified that this lasted some eight weeks. (A period significantly shorter than what Mary Colvin testified to.) It should be noted that John Colvin is retired and the time he spent caring for his wife caused no loss of actual income nor any lost out-of-pocket expenses (that is, beyond medical bills and transportation costs to therapists).

As to post-injury loss of functionality, the Pre-Inquest Statement describes Mary Colvin as now walking with a limp, but a Kessler evaluation document from 2007 states that "all of the biomechanical characteristics of gait appear normal in all planes of motion for all phases. No abnormalities are evident." John Colvin also testified that his wife's exercise regime sometimes interferes with the activities they used to do together. This is true, for example, when they ski. In the past, they skied on the same hills, but now he pursues

intermediate runs, and she skis on less taxing hills and for short periods of time.

    11.  Mary Colvin's Right Knee. Mary Colvin had arthroscopic surgery for her right knee some 4 or 5 years prior to the accident. Surgery was to effect repair in regard to a previously torn lateral meniscus. It healed and she did not wear a brace thereafter. The Court is without before and after images to compare precisely what injuries she sustained in Mexico were unrelated to her prior injuries. For example, Dr. Murphy described her as suffering from degenerative joint disease as early as 2005, although he also described her injuries as stemming from her accident in Mexico. In other words, Dr. Murphy's report describes some of her right-knee related injuries as stemming from the accident, but his report is not as clear as it could be.

 After the accident, and upon returning to the United States, Mary Colvin visited Dr. Murphy, and she complained of injuries to her right knee. This knee initially swelled to the size of small grapefruit. It appears that Mary Colvin gained roughly 12 pounds in the immediate aftermath of the injury. After the swelling to her knee went down, Mary Colvin lost this weight. Dr. Murphy prescribed the use of knee braces (which she continues to use) and an elastic stocking (which she no longer uses) in addition to crutches which she had been using even while in Mexico. She used crutches for roughly a month. Now she uses knee braces for both knees on occasion as needed. Early Kessler Center records described her knee as sprained. Mary Colvin testified that her knee continues to cause her pain and her husband testified that she sometimes wakes up at night from the pain. These claims are somewhat

undercut by the fact that her current pain medication regime is Tylenol and other over-the-counter drugs. 2005 medical records indicate that the pain associated with the right knee had been severe, but has since "gotten better."

Mary Colvin was punctured in two spots in the area of her right knee. Her right knee sustained multiple ligament tears and sprains, including, for example, a tear to a previously torn and subsequently healed lateral meniscus, a tear to the anterior horn of the medial meniscus, and a bone bruise to the inside of right knee. It is not clear how significant these tears are. The report associated with the First MRI to her right knee describes her as having a "mild MCL sprain, with no significant tear." She complains of complete loss of cartilage – bone on bond articulation – however, a 2007 MRI states that there "are no abnormal points of cartilage loss." Dr. Murphy also indicated that she may need "additional therapy and/or surgery on [her] knees due to the degenerative joint disease [and] [s]he *may* need a total knee replacement in the future." Murphy's determination in this regard, particularly his repeated use of "may," is speculative. Even if it comes to pass that Mary Colvin should need a replacement knee, Murphy's report leaves unclear the extent to which that result is connected to the accident, as opposed to the natural consequence of aging and to her prior knee injury.

Mary Colvin complains that she has lost functionality in regard to her right knee injury. She can drive, but sitting in the car for an extended period is painful, and she is unable to use a vacuum cleaner. As to skiing, *she still skis*, but only on beginner slopes, where she used to ski down intermediate slopes. She asserts that she only has 20% of her prior capacity.

As a result she and her husband now ski separately, as he skis on more advanced slopes. She now does 3 or 4 runs without a break, but had done 10 to 12. She now wears braces while skiing. *She can run*, but it causes pain in her right knee. She cannot squat to the floor, which she used to be able to do, but she can kneel. She testified that she can walk, but is limited to 200 feet, and she has difficulty negotiating stairs. Her testimony as to the extent of these limitations, functionally and temporally, was somewhat vague, nor was her testimony always consistent with that of John Colvin's. Plaintiff claims she can run; she claims she can ski, a sport requiring significant knee and back movement, and, can complete as many as four beginner runs. She negotiated the courtroom without difficulty. This is somewhat difficult to square with the claim that she is limited to as little as 200 feet when walking.

In summary, Mary Colvin's testimony indicates that she sustained *some* injuries to her right knee in consequence of the accident, for which she sought treatment in the United States upon her return. The Court emphasizes that although some of her right-knee related injuries were in consequence of the accident, the evidence does not establish that all her current right-knee related limitations are connected to the accident, as opposed to her aging or in relation to pre-existing conditions (or in connection with her prior surgery to her right knee). She has been advised by her doctors to proceed with surgery to her right knee, but she has elected not to proceed with surgery at this time.

12.    Mary Colvin's Left Knee. Unlike her right knee, Mary Colvin had no prior surgery in regard to her left knee, indeed, her left knee had not required a doctor's care

in the past. Mary Colvin's Kessler Center records from October 2005, when she first sought therapy, do not indicate *any* complaints, complications, or prescribed therapy or other treatment for the left knee (or spine). Apparently she first complained of left knee pain at Kessler on November 26, 2005. This is seven full weeks after the accident. An MRI at the time indicated that certain ligaments were torn. By November 2007, her Kessler therapists described her left knee injury as having "slight symptoms" and that "no abnormalities [were] evident." Mary Colvin states that her left knee is less damaged than her right, but it, nevertheless, causes her more pain and, in fact, has led to greater loss of functionality. Injuries include a tear to the posterior horn of the lateral meniscus, a tear to the anterior horn of the lateral meniscus, and a partially torn fibular collateral ligament. She was advised to have knee surgery and had it on October 17, 2007, two years after the Mexican injury. She was disappointed in the result from the surgery and will not now have either knee replaced as recommended by her doctors. By December 2007, her Kessler therapists indicated that there is "no pain presently" in connection with her knee. Mary Colvin testified that some sharp occasional pain remains. There is minimal scarring in connection with the 2007 surgery.

     In summary, as with her right knee, so too with her left knee, the evidence establishes that her left knee was injured in consequence of the accident. But how much of her post-2007 symptoms and limitations arose in consequence of the accident, and how much was a normal consequence of aging is not pellucidly clear. As explained, she did not have her left knee

examined until seven full weeks after the accident had elapsed, and she did not have surgery on her left knee until some two years after the accident.

        13.     Mary Colvin's Lumbar Spine. Mary Colvin's Kessler Center records from October 2005, when she first sought therapy, do not indicate any complaints, complications, prescribed therapy, or other treatment for her left knee or spine. At the hearing, she explained that she thought the pain she had experienced emanated from her foot. Only nearly two years later did her doctor, Dr. Zorderma, "put it together," and determine that the pain in her foot came from her back. On or about July 9, 2007, this doctor had Mary Colvin have an MRI of her back and both knees. Apparently, this doctor no longer practices medicine and Plaintiffs' attorney has no report from him. Mary Colvin now complains of a herniated disk and bulge at L5-S1 and a bulge at L4 – causing radiating pain to her left leg and foot, although a 2007 MRI describes these bulges as "mild" or "small," and notes an absence of "spinal canal stenosis."

She explained at the hearing that prior to her accident she had never been diagnosed with bulges or back problems and that she never experienced such back-related pains prior to the accident. Mary Colvin has only taken Tylenol and aspirin for pain. She believes she has also taken naperson, but she is not sure. In other words, two years after the accident, no pain medication regime was in place. At the hearing she indicated that back pain is now largely resolved except once a day when turning she gets a sharp pain. Notwithstanding that she testified that she had no back-related injuries or pain prior to the accident, the Court is

not satisfied that any proof put forward by Plaintiffs connects the dock-related injuries to her back problems. As such no damages will be granted on this basis. The nearly two year delay in regard to diagnosing these back-related injuries also undermines the claim that they are causally connected to the accident.

      14.    Other Injuries. Mary Colvin complains of several other bodily injuries. Generally, these other injuries are not well supported by objective medical evidence or by medical reports or by testimony. As such no damages will be granted o this basis.

      15.    In summary, the Court finds by a preponderance of the evidence that some of the *limitations* and *injuries* relating to Mary Colvin's right knee and left knee were caused by the accident. The Court does not find that *all* the limitations about which she complains were caused by the accident. The trauma to her right knee is supported by a MRI; likewise the trauma to her left knee is supported by a MRI. She had surgery on her left knee in 2007: it is more likely than not that her need for surgery in 2007 was causally connected to her fall on the dock. Her medial meniscus was torn, but there were not fractures or open wounds requiring stitches or sutures. She was in substantial pain in the immediate aftermath of the fall in consequence of the fall and the punctures caused by nails. She was totally or partially immobilized for 8 weeks in consequence of the accident, during which time she was under her husband's care.

Many of Mary Colvin's complaints were not well-supported by objective medical evidence or even by medical findings or a diagnosis. The Court lacks before and after images

or testimony relating to her pre-injury state, even in regard to her right knee, which had been operated on several years prior to the accident. The Court notes that Mary Colvin has chosen not to proceed with recommended surgery to her right knee did not have surgery on her left knee until two years after the accident. With regard to certain claims, such as her back injury, no diagnosis was reached until roughly two years after the accident. As such, the Court has little basis to find that the accident caused the subsequent back injury. The Court notes that she only takes over-the-counter drugs for pain management, and that she continues to ski and run although 69 years old. The accident itself left no significant scarring. Indeed, Plaintiffs remained in Mexico after the accident (as she remained on the boat in the immediate aftermath of the fall), rather than returning home for medical treatment, although the only facilities she had access to in Mexico were fairly rudimentary. Finally, although the Court credits much of Mary Colvin's testimony, some of her testimony was vague and conflicted with that of John Colvin's.

    **B.**    **Conclusions of Law**

    1.    Negligence. Plaintiff Mary Colvin was physically injured in consequence of Defendants' negligence. She suffered non-negligible damages, including pain and suffering. John Colvin suffered a loss of consortium, particularly during the 8 weeks following the accident during which he cared for his wife.

    2.    Vacation Losses. In effect, five days of a scheduled six day vacation were lost. The cost of the vacation with travel costs was $4,513. Plaintiffs damages can be

calculated, i.e., 5/6 * $4,513 = **$3,761**. They are entitled to recover the full amount.

       3.       Plaintiffs' costs of medication and therapy was some **$18,495**. They are entitled to recover the full amount.

       4.       Plaintiffs cost of travel to and from therapy amount to $80. They are entitled to recover the full amount: **$80**.

       5.       Readily calculable damages include: $3,761 + $18,495 + $80 = **$22,336**.

       6.       The Court has considered Plaintiffs' post-hearing filing relating to comparative verdicts and damages. The cases considered are not on-point. Here damages relate largely to Mary Colvin's pain and suffering, some of which continues to this day, and limitations to function and life style in consequence of the injury. But, as explained above, Plaintiffs have not established that the accident caused the spine related injuries or many of the other injuries and functional difficulties that may very well have been in consequence of the normal aging that all persons, including persons over 65, such as Mary Colvin, experience. As to her right knee, she has elected not to have surgery. The Court also notes that she has sought out no pain medication regime or treatment program apart from over-the-counter drugs.

For these reasons, the Court awards $150,000 for damages to Plaintiffs, apart from the damages readily subject to calculation. The Court distinguishes this case from *Brodsky v. Grinnell Haulers, Inc.*, 827 A.2d 1103 (N.J. Super. App. Div. 2003) (upholding an award of $350,000 where defendants' negligence caused plaintiff to have surgery for open

fractures), *aff'd in part*, *rev'd in part on other grounds*, 853 A.2d 940 (N.J. 2004). The Court also distinguishes *Compere v. Collins*, 799 A.2d 721 (N.J. Super. Law Div. 2002) (upholding $200,000 to a 36 year old plaintiff for permanent injury to her knee in consequence of which plaintiff sought surgery), *disapproved of on other grounds*, *James v. Torres*, 808 A.2d 873 (N.J. Super. A.D. 2002).

       7.      Generalized damages as determined by the Court amount to **$150,000**.

       8.      Total damages equal **$172,336**.

## V.   CONCLUSION

For the reasons elaborated above, the Court has determined that the Colvins have been damaged by the Defendants in the amount of **$172,336**.

An appropriate final judgment accompanies this opinion.

|  |  |
|---|---|
|  | s/ William J. Martini |
| **DATE: April 9, 2010** | **William J. Martini, U.S.D.J.** |